Court Minutes and Order

| | |
|---|---|
| DATE: | May 26, 2020 |
| JUDGE: | Pamela Pepper |
| CASE NO: | 2018-cv-2005 |
| CASE NAME: | David Toshner, *et al.* v. Jordan Goodman, *et al.* |
| NATURE OF HEARING: | Motion Hearing |
| APPEARANCES: | Michael Schaalman – Attorney for the plaintiffs |
| | Matthew Splitek – Attorney for the Knowles Systems, Inc. and Lynette Robbins, defendants |
| | Richard Boone – Attorney for Jordan Goodman |
| | M. Nicol Padway – Attorney for Robin Ellis |
| COURTROOM DEPUTY: | Kristine Wrobel |
| TIME: | 10:10 a.m. – 11:27 a.m. |

## AUDIO OF THIS HEARING AT DKT. NO. 52

The court apologized to the parties for the time it had taken to consider the claims it had left unresolved from that the December 20, 2019 hearing. The court recounted that while it had planned to issue a written decision, its calendar had prevented that. The court noted it would give the parties an oral decision today on the remaining claims in the case.

With regard to Counts I and II, the negligence claims, the court noted that the plaintiffs had argued at the December 20 hearing that Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck, 127 Wis. 2d 127 (1985), stood for the proposition that financial advisers can be liable in general negligence for failure to do due diligence. The court disagreed, finding only one line in the opinion that discussed general negligence duties: "The broker, however, does owe the customer a **duty of ordinary care**." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck, 127 Wis. 2d 127, 133 (1985). Because Merrill Lynch created no duty as to financial advisors, the court turned to Wisconsin negligence law.

The court cited the four elements of a Wisconsin negligence claim: "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." Behrendt v. Gulf Underwriters Ins. Co., 318 Wis. 2d 622, 633 (2009).

While it noted that most jurisdictions follow the majority opinion from Palsgraf v. Long Island Railroad, which says that people owe other individuals a duty to avoid activities that create a foreseeable risk of harm to those individuals. 162 N.E. at 99–100 ("In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining . . . ."), the court observed that Wisconsin follows dissent from Palsgraf, which says that "[e]veryone owes to **the world at large** the duty of refraining from those acts that may unreasonably threaten the

safety of others." Behrendt, 318 Wis. 2d at 635 (emphasis added); see also Hocking v. City of Dodgeville, 318 Wis. 2d 681, 690 (2009) (noting that Wisconsin follows the Palsgraf dissent); Hoida, Inc. v. M & I Midstate Bank, 291 Wis. 2d 283, 322 (2006) (Bradley, J., dissenting) (same). In other words, a person doesn't owe a duty to any specific individual, but rather to the entire world. See Tesar v. Anderson, 329 Wis. 2d 240, 249 (Wis. Ct. App. 2010). Wisconsin courts interpret this language to mean that "every person is subject to a duty to exercise ordinary care in all of his or her activities"—a "duty of ordinary care." See Melchert v. Pro Elec. Contractors, 374 Wis. 2d 439, 464 (2017) (quoting Behrendt, 318 Wis. 2d at 627–28).

The court emphasized that this doesn't mean that the duty of ordinary care is unlimited. See Brenner v. Amerisure Mut. Ins. Co., 374 Wis. 2d 578, 588–89 (2017) ("MWF says it is 'unquestionable' that Charter would owe a duty to the Brenners absent the doctrine of *caveat emptor* 'because everyone owes a duty to everyone else.' (Citing Behrendt v. Gulf Underwriters Ins. Co., 2009 WI 71, 318 Wis.2d 622, 768 N.W.2d 568.) . . . This characterization of Behrendt suggests we have concluded that every negligence claim arrives at court with the first element already proven as a matter of law, or that we have eliminated the first line from the negligence quatrain. We have not."). People only have a duty to do what's "reasonable under the circumstances." Hocking, 318 Wis. 2d at 690 (citing Hoida, 291 Wis. 2d at 306–08).

In Brenner v. Amerisure, for instance, the Wisconsin Supreme Court ruled that ordinary care did not require a former possessor of a property to warn *all* future possessors that there were holes in the floor underneath plywood boxes. See 374 Wis. 2d at 615–16. Under the doctrine of *caveat emptor,* the former possessor's duty to the world at large to warn people about the holes ended when they transferred possession of the property. Id.

So, the court held, the scope of the duty of ordinary care depends on the circumstances in which the claim arose. Brenner, 374 Wis. 2d at 589 (quoting Behrendt, 318 Wis. 2d at 635). "For example, what is comprised within ordinary care may depend on the relationship between the parties or on whether the alleged tortfeasor assumed a special role in regard to the injured party." Behrendt, 318 Wis. 2d at 635 (quoting Hoida, 291 Wis. 2d at 307). A statute or contract can also help define the duty. See, e.g., Melchert, 374 Wis. 2d at 464 (assuming without deciding that the defendant's duty of ordinary care was "coextensive with the requirements of" a state statute); Hoida, 291 Wis. 2d at 310 ("These contractually assumed obligations and agreed upon limitations for M & I shaped its duty of ordinary care in disbursing the proceeds of the construction loan because they set out what the parties agreed was reasonable under the circumstances."). Courts even have looked to Restatement sections to fill in the duty. See, e.g., Brenner, 374 Wis. 2d at 590–91 (reviewing Restatement (Third) of Torts: Physical & Emotional Harm § 51 "to determine whether it provides any insight on the nature of [the defendant's]

2

duty under these circumstances."); Hatleberg v. Norwest Bank Wisconsin, 283 Wis. 2d 234, 254 (2005) (defining duty using the Restatement (Second) of Torts §552).

The court pointed out that another unique feature of Wisconsin negligence is that negligence and liability are distinct concepts. "Even after the four negligence elements have been established, courts may limit liability by considerations of public policy." Tesar, 329 Wis. 2d at 248–49 (citing Alvarado v. Sersch, 262 Wis. 2d 74, 82–84 (2003)). The Wisconsin Supreme Court has articulated six policy factors to consider: (1) the injury is too remote from the negligence; (2) the recovery is wholly out of proportion to the culpability of the negligent tortfeasor; (3) the harm caused is highly extraordinary given the negligent act; (4) recovery would place too unreasonable a burden on the negligent tortfeasor; (5) recovery would be too likely to open the way to fraudulent claims; and (6) recovery would enter into a field that has no sensible or just stopping point. Behrendt, 318 Wis. 2d at 641.

The court emphasized, however, that "liability is the rule and relief for public policy reasons is the exception." Tesar, 329 Wis. 2d at 250. Courts should not strike down cases on the basis of public policy except "in cases so extreme that it would shock the conscience of society to impose liability." Id. (quoting Pfeifer v. Standard Gateway Theater, Inc., 262 Wis. 229, 238, 55 N.W.2d 29 (1952); and citing Fandrey v. American Family Mut. Ins. Co., 2004 WI 62, ¶ 15, 272 Wis.2d 46, 680 N.W.2d 345; Bowen v. Lumbermens Mut. Cas. Co., 183 Wis.2d 627, 656, 517 N.W.2d 432 (1994)). Additionally, (non)liability based on public policy is determined on a case-by-case basis. Tesar, 329 Wis. 2d at 252–55. "[P]rior decisions seldom dictate the result in subsequent cases because so frequently there are new or different facts which suggest a different result." Id. at 255.

Against, this background, the court reviewed the plaintiffs' arguments. At the December hearing, defendant Knowles Systems ("Knowles") argued that the "duty of ordinary care" is limited to physical harms only, not economic ones. According to Knowles, the plaintiffs weren't physically injured by Knowles's actions, so Knowles didn't violate the duty of ordinary care. Knowles based its argument on the Palsgraf dissent and two Seventh Circuit cases: Midwest Knitting Mills, Inc. v. United States, 950 F.2d 1295, 1300 (7th Cir. 1991); and Leadfree Enterprises, Inc. v. U.S. Steel Corp., 711 F.2d 805, 806 (7th Cir. 1983).

The court disagreed, finding that the duty of ordinary care applies to non-physical harm. It noted that the Wisconsin Supreme Court applied the duty to non-physical harm in Hatleberg v. Norwest Bank Wisconsin, 283 Wis. 2d 234, 257 (2005) ("Wells Fargo negligently breached a duty to [the plaintiff] by continuing to advise her to contribute money to the trust to save estate taxes after it realized the trust was defective.").

Knowles argued at the hearing that the duty of ordinary care was explicitly limited to the unreasonable risk of "injury or damage to a person or property." The court noted that Knowles didn't raise this argument in their brief, and that even if they had, the "injury or damage to a person or property" language doesn't appear anywhere in Palsgraf. And of the three leading cases on duty in Wisconsin—Behrendt v. Gulf Underwriters Insurance Company, 318 Wis. 2d 622 (2009); Hocking v. City of Dodgeville, 318 Wis. 2d 681 (2009); and Hoida, Inc. v. M & I Midstate Bank, 291 Wis. 2d 283 (2006)—only the Hoida majority opinion uses the phrase "injury or damage to a person or property." See Hoida, 291 Wis. 2d at 306.[1] Other cases use the following language: "[e]veryone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." Behrendt, 318 Wis. 2d at 635; Tesar, 329 Wis. 2d at 355; Palsgraf, 162 N.E. at 103 (Andrews, J., dissenting).

And again, the court noted that Wisconsin courts had applied the duty in cases that did not involve physical injury. In Hatleberg v. Norwest Bank Wisconsin, a trust instrument was missing an important provision that would've exempted the trust from certain taxes. 283 Wis. 2d at 242. Defendant Wells Fargo knew about the defect but told the client that it was safe to keep contributing to the trust. Id. at 243, 247. When the client eventually died, the defect exposed her estate to significant tax liability. Id. at 243. The client's daughter brought a suit in negligence to recover the lost money. Id.

Not only did the Wisconsin Supreme Court not summarily dismiss the case for lacking a physical injury, but it cited the Palsgraf dissent for the proposition that everyone owes the world a duty of ordinary care. Id. at 246. The court went on to analyze the scope of the duty under the circumstances, eventually ruling that that Wells Fargo breached its duty to not provide false information. Id. at 256–57.

Knowles argues that two Seventh Circuit cases—Midwest Knitting Mills, Inc. v. United States, 950 F.2d 1295 (7th Cir. 1991) and Leadfree Enterprises, Inc. v. U.S. Steel Corp., 711 F.2d 805 (7th Cir. 1983)—supported their argument, but those cases are inapplicable for two reasons. First, they were decided in 1983 and 1991, respectively, long before Hatleberg (2005) and Hoida (2006).

Second, Midwest and Leadfree dealt with a different legal issue: the economic loss doctrine, which says that a purchaser can't recover solely economic damages in negligence claims. See Midwest Knitting Mills, 950 F.2d

---

[1] The language appears in the concurrence of the other two cases. See Behrendt, 318 Wis. 2d at 649 (Abrahamson, C.J., concurring); Hocking, 318 Wis. 2d at 708 fn. 16 (Abrahamson, C.J., concurring).

at 1300–01 (incorrectly guessing that "Wisconsin [courts] would decline in all circumstances to allow a negligence suit for the recovery of only economic damages, even when there is no contractual relationship between the parties."); Leadfree Enterprises, 711 F.2d at 808 ("The appellants erroneously contend that this case demonstrates that purely economic loss, in the absence of any harm to the plaintiffs' person or property, is recoverable in Wisconsin.").

Having established that the duty of ordinary care applied, the court reviewed Counts I and II of the amended complaint for the acts the plaintiffs claimed violated that duty: the defendants' failure to perform "reasonable due diligence on the Plaintiffs' behalf prior to recommending and selling them Woodbridge FPCM Notes," (the "duty to do due diligence"), dkt. no. 28 at ¶¶91, 96; the Knowles Systems defendants' failure to check whether the FPCMs were registered and whether the plaintiffs met any exception to registration, id. at ¶92; defendant Goodman's failure to check if the Knowles Systems defendants were licensed to sell securities as required under Wisconsin law, id. at ¶96 (collectively with the previous failure "the negligence *per se* duties"); and all defendants' failure to "recommend to Plaintiffs only investments which were suitable to their financial circumstances" (the "duty to give good advice"), id. at ¶¶92, 96.

The plaintiffs argued that the defendants had a duty to recommend investments that were suitable to the plaintiffs' financial circumstances, including an obligation to tell the plaintiffs to diversity their investments. Id. The plaintiffs argue that the defendants breached this duty. The court stated that even if it assumed the defendants had such a duty, the allegation assumed that the defendants knew Woodbridge was a Ponzi scheme. According to the amended complaint, Woodbridge's FPCM securities looked like safe, surefire bets. See Dkt. No. 28 at ¶¶23, 25–26, 33, 37–38, 78–85. The defendants thus would've fulfilled their duty by recommending Woodbridge. If the defendants knew the Woodbridge products part of a Ponzi scheme, their recommendations would have amount to more than mere negligence.

The plaintiffs also argued that the defendants were negligent because they failed to take steps to carry out certain duties imposed by Wisconsin statutes. The plaintiffs argue that the Knowles defendants failed to realize that Woodbridge's FPCMs were unregistered securities, and therefore that the Knowles couldn't sell the FPCMs to the plaintiffs in Wisconsin unless the plaintiffs fit specific exceptions under the law. Dkt. No. 28 at ¶93; see Wis. Stat. §§551.301, 551.509(2), (7). They also argue that defendant Goodman was negligent because he didn't know that the Knowles defendants weren't licensed to sell securities in Wisconsin in violation of Wis. Stat. §551.509(2). Dkt. No. 28 at ¶96.

The court concluded that it sounded as if the plaintiffs were arguing negligence *per se*. The court found that the plaintiffs had not alleged negligence

*per se,* which has its own elements, see Taft v. Derricks, 235 Wis. 2d 22, 30 (Wis. Ct. App. 2000). The court noted that the plaintiffs did not need to allege negligence do address failures to comply with these statutes—they could make the statutory claims directly, as they did in Count V.

At the hearing, the plaintiffs argued that the defendants had a duty to do due diligence because the defendants said in their emails that they were "doing your due diligence." Hearing Recording at 11:08:55–09:06. The plaintiffs argued that the defendants breached this duty by not conducting any due diligence whatsoever. Dkt. No. 28 at ¶¶92, 98.

The court said that, even assuming that the defendants' duty of ordinary care included a duty to conduct due diligence in these circumstances, the plaintiffs had not alleged what, if anything, the defendants should've done, or what they failed to do to. The court opined that "due diligence" was a vague concept, and that the plaintiffs basically had allege that the defendants must not have conducted due diligence, because the defendants didn't realize that Woodbridge was a Ponzi scheme. Dkt. No. 28 at ¶¶93, 96. The court said that this sounded like a *res ipsa loquitur* argument—which, again, the plaintiffs had not alleged. *Res ipsa loquitur* has two elements: "(1) the event in question must be of a kind which does not ordinarily occur in the absence of negligence; and (2) the agency or instrumentality causing the harm must have been within exclusive control of the defendant." Lambrecht v. Estate of Kaczmarczyk, 241 Wis. 2d 804, 819–20 (2001). The court concluded that the plaintiffs had alleged neither elements—they made no allegations about (a) what steps the defendants should've taken to conduct "due diligence" in these circumstances, (b) what steps, if any, the defendants did take, and (c) how these steps were insufficient under the circumstances. In other words, the plaintiffs failed to plead breach, because they didn't explain how the defendants failed to conduct due diligence.

The court noted that defendant Goodman had taken a different route, arguing that brokers and their agents do not owe customers a duty to do due diligence absent an express contractual provision. Dkt. No. 34 at 10–11; Dkt. No. 42 at 1–3. He cited eight cases in support of this argument, but only four directly say that defendants don't have a duty to do due diligence on a customer's behalf. The court observed that all four of those cases rely on other jurisdictions' law; as explained earlier, Wisconsin's negligence jurisprudence is different from the laws of other jurisdictions. Tesar, 329 Wis. 2d at 263 ("This test [duty to the world] is generally disfavored, having been adopted by courts in only two jurisdictions. *See Touche Ross & Co. v. Commercial Union Ins. Co.*, 514 So.2d 315 (Miss.1987); *Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis.2d 376, 335 N.W.2d 361 (1983)."). The Court of Appeals in Tesar rejected analysis from several cases from other jurisdictions because those cases didn't use Wisconsin's unique "duty to the world" test. Id. at 261–65.

6

Defendant Goodman cited <u>BNP Paribas Mortg. Corp. v. Bank of Am., N.A.</u>, 866 F. Supp. 2d 257, 266 (S.D.N.Y. 2012); <u>Brown v. J.P. Turner & Co.</u>, 2011 U.S. Dist. LEXIS 53118, *15, 2011 WL 1882522 (N.D. Ga. May 1, 2011); <u>Vodicka v. Lahr</u>, 2012 Tex. App. LEXIS 4557, *19-20, 2012 WL 2075713; and <u>Gabriel Capital, L.P. v. Natwest Fin., Inc.</u>, 137 F. Supp. 2d 251, 263 (S.D.N.Y. 2000), for the proposition that there is no duty to do due diligence. Dkt. No. 34 at 10–11; Dkt. No. 42 at 1–3. Those cases were decided under the laws of New York, Georgia, Texas and a federal statute. None of these jurisdictions follow the Palsgraf dissent.

Next, Goodman cited <u>Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u>, 594 B.R. 167, 198–99 (Bankr. S.D.N.Y. 2018) for the proposition that the red flags here show that the defendants were tricked the same as the plaintiffs. It's useful for that purpose but sheds little light on claims of negligence.

Goodman also cites <u>Hatleberg</u> and <u>Baumeister v. Automated Prod.</u>, Inc., 277 Wis. 2d 21, 35 (2004) for the proposition that the Wisconsin Supreme Court generally rules against finding that the duty of ordinary care includes a responsibility to affirmatively act for the protection of third parties. Dkt. No. 34 at 11. The defendant described <u>Baumeister</u> as finding that an "architect with no responsibility or control over the construction of a building assumed no duty to supervise the construction." <u>Id.</u> The defendant explained that the <u>Hatleberg</u> court ruled that a "bank trustee who did not draft a trust document assumed no duty to ascertain whether the trust worked for the state purpose." <u>Id.</u>

First, a clarification. The court in <u>Hatleberg</u> found no *general* duty for trustees to examine the trust to determine whether it worked for the stated purpose, because normally a trustee doesn't know what that stated purpose is. <u>Hatleberg</u>, 283 Wis.2d at 249 ("We are reluctant to impose liability on a trustee for not discovering and correcting a defect in a trust resulting from negligence by an unaffiliated drafter, unless that responsibility was assumed by contract. We therefore decline to impose a general duty to review a trust document drafted by another and draw legal conclusions as to its effectiveness.").

Additionally, as the <u>Tesar</u> Court pointed out, liability in Wisconsin is decided on a case-by-case basis. 329 Wis. 2d at 252–55, fn. 14. The court put it this way:
> In *Beacon Bowl, Inc. v. Wisconsin Electric Power Co.,* 176 Wis.2d 740, 763, 501 N.W.2d 788 (1993), the court addressed a court of appeals certification question asking whether *Ransome v. Wisconsin Electric Power Co.,* 87 Wis.2d 605, 275 N.W.2d 641 (1979), "applied" in the certified case. The supreme court replied: "*Ransome* has relevance to this action although it does not 'apply' to this action. Liability is

7

> determined on a case-by-case basis in negligence and strict liability cases, depending on the facts." *Id.*

Id. at fn. 14.

It doesn't appear that the Wisconsin Supreme Court has ruled that defendants *never* owe a duty to third parties absent a contractual provision. Hatleberg and Baumeister were both decided on their facts (at least to some extent), as was Merrill Lynch. This court will not adopt such a rule.

Goodman's last case is Cattau v. Nat'l Ins. Servs. of Wisconsin, Inc., 383 Wis. 2d 600 (Wis. Ct. App. 2018). Goodman quoted the following passage from the case:

> The Plaintiffs seem to hang on to the idea that MidAmerica and NIS are experts, and thus automatically have some responsibilities associated with that. But that cannot be the long and short of it . . . Simply saying Jim is an "expert" and therefore should be held liable is not enough. A sufficiently pled complaint would have to show that Jim had a duty and ability to act, to speak up, and it would tell us what actions Jim did or did not take.

Dkt. No. 42 at 2. Goodman's point in quoting this is that the plaintiffs didn't really cite anything for due diligence, and that their only real argument is that the defendants are experts. Id. This is another iteration of the other defendants' arguments that the plaintiffs have not alleged what it was the defendants were supposed to do that they didn't do.

For these reasons, the court granted the motions to dismiss Counts I and II.

With regard to Counts III and IV, breach of fiduciary duty, the court returned to Merrill Lynch, on which the plaintiffs relied for their argument that the defendants owed them a fiduciary duty.

In Merrill Lynch, George Boeck, an experienced investor, opened a non-discretionary account with Merrill Lynch in 1977. Merrill Lynch, 127 Wis.2d at 131. He chose Merrill Lynch after seeing an advertisement in the Wall Street Journal, and because he believed Merrill Lynch "had a good reputation for financial services and a strong research program in the commodities field." Id. About a year into his time with Merrill Lynch, Boeck's broker at the company incorrectly told Boeck that Merrill Lynch's soybean expert estimated a very low soybean yield for the next year. Id. at 131–32. The expert made no such estimate, and Merrill Lynch expected a normal or even high soybean yield. Id. The broker realized his mistake after Boeck's first soybean purchase, but never told Boeck—even when Boeck instructed the broker to make further purchases based on the incorrect information. Id. at 132. When Boeck's investments

8

inevitably failed, Merrill Lynch sued him for money owed related to these bad transactions. Id. at 130–31. Boeck counterclaimed for his losses, claiming (among other things) that Merrill Lynch breached its fiduciary duty to him and also negligently misrepresented the soybean estimates. Id. at 132–33.

The Wisconsin Supreme Court first clarified that brokers owe fiduciary duties to customers with *discretionary* accounts—accounts in which the broker, not the customer, makes the investment decisions. Id. at 133–34. But for non-discretionary accounts like Boeck's, the court concluded that brokers don't have a fiduciary duty absent a contractual provision or other "special circumstances from which the law will assume an obligation to act for another's benefit." Id. at 134, 137.

The Merrill Lynch court did not define what it meant by "special circumstances." However, it did rule that there is no special circumstance where the broker "gain[s] the [customer]'s trust and confidence and purport[s] to advise [the customer] with the [customer]'s interest in mind." Id. at 136. The court continued,

> [a] fiduciary relationship does not arise merely because a broker offers advice and counsel upon which a customer has a right to place trust and confidence. The right to place trust and confidence in the reliability of representations involving commercial transactions **already is protected by the law of misrepresentation**. [internal citation omitted].

Id. (emphasis added). The court went on to say that

> [a] fiduciary relationship arises from a formal commitment to act for the benefit of another (for example, a trustee) or from special circumstances from which the law will assume an obligation to act for another's benefit. **The mere fact of reliance on representations, therefore, does not necessarily create a relationship of trust and confidence leading to a fiduciary duty.** Thus, we do not hold that a fiduciary duty may arise out of every circumstance where there is a relationship of trust and confidence between the parties.

Id. (emphasis added). To borrow the plaintiffs' language, a "relationship of trust and confidence," without more, does not create a fiduciary relationship. The court concluded that turning brokers into fiduciaries to clients with non-discretionary accounts would improperly turn the broker into a "guarantor of a customer's investments." Id. at 137.

The court ruled that Boeck did not have a contractual provision or "special circumstance" that would support a fiduciary duty, despite his extensive relationship of trust and confidence with his broker and the company. Id. at 134. Therefore, the court denied Boeck's claim that the broker

9

and Merrill Lynch breached a fiduciary duty by failing to correct the incorrect soybean estimate.

The Wisconsin Supreme Court explained in later cases that that courts should consider "a variety of factors" to determine whether there are special circumstances giving rise to a fiduciary duty, including: "whether there is dependence and inequality based on weakness of age or mental strength, lack of business intelligence, inferior knowledge of facts involved, or other conditions giving one side an advantage over the other." See Hatleberg v. Norwest Bank Wisconsin, 283 Wis. 2d 234, 253 (2005).

So, this court concluded, fiduciary duties arise in only two circumstances: where there's a contractual provision, or where there are "special circumstances from which the law will assume an obligation to act for another's benefit." Merrill Lynch, 127 Wis. 2d at 134, 137. There was no contractual provision here, so the court looked to the Hatleberg factors: "dependence and inequality based on weakness of age or mental strength, lack of business intelligence, inferior knowledge of facts involved, or other conditions giving one side an advantage over the other." Hatleberg, 283 Wis. 2d at 253. But creating a relationship of trust and confidence between a broker and a customer is not enough on its own to create a "special circumstance." Merrill Lynch, 127 Wis. 2d at 136. The Wisconsin Supreme Court also explicitly "refuse[d] to hold that a broker is liable as a fiduciary for representations to an investor with a nondiscretionary account." Id. at 137. The court reasoned that there is no need to duplicate the law against misrepresentation in fiduciary theory. See id. at 136.

Finally, the Hatleberg court stated in dicta that a defendant's label ("financial adviser," "investment planner," "investment adviser," etc.) doesn't matter—the court should consider the defendant's actions and the parties' relationship. 283 Wis. 2d at 252–53 ("Whether Wells Fargo styles itself an 'investment planner,' 'financial planner,' or 'financial advisor,' it bears responsibility for its actions. A fiduciary duty may arise in these circumstances.").

The plaintiffs argued that the defendants were fiduciaries and therefore owed a duty to do "due diligence" into Woodbridge's offers before recommending them to the plaintiffs. Dkt. No. 28 at ¶¶104–05, 109–10. The court noted, however, that the plaintiffs made different arguments in their briefs and at the December hearing.

The plaintiffs first argued in their brief that "[f]iduciary relationships implied in law arise when there exists a relationship of trust and confidence between the parties." Dkt. No. 50 at 21 (quoting Merrill Lynch, 127 Wis. 2d at 136, 137)). This court noted that Merrill Lynch held the opposite:

> [W]e do not hold that a fiduciary duty may arise out of every circumstance where there is a relationship of trust and confidence between the parties.

127 Wis. 2d at 136.

The plaintiffs then indirectly acknowledged Hatleberg's holding that courts find "special circumstances" by examining factors like "inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other." Dkt. No. 40 at 22 (quoting Prod. Credit Ass'n of Lancaster v. Croft, 143 Wis. 2d 746, 755 (Ct. App. 1988)). The plaintiffs cited many reasons why there were special circumstances here. However, many of these reasons are simply variations on "representations to an investor with a nondiscretionary account," which do not alone create a fiduciary duty. See Merrill Lynch, 127 Wis. 2d at 137 (emphasis added). For example: the defendants sent emails and communications intended to "establish a client/customer relationship," dkt. no. 40 at 22; the defendants represented themselves as a "team of strategists" and "highly skilled professionals," id.; the defendants represented that the investments were "super safe," id. at 23; and the defendants claimed to have done due diligence on the plaintiffs' behalf, id. These representations did not create a fiduciary duty.

The plaintiffs allege that one of them—Mr. Toshner—was "in his early 60's, recovering from an industrial accident which left him permanently disabled, relying on fixed income from SSD, that he could not afford to lose money, and that he had a sizable insurance settlement from his accident." Dkt. No. 50 at 22–23. They also argue that the there was a knowledge imbalance because the plaintiffs "lacked material information and skill available to the Defendants and, thus, did not assume risk based on information that was made available to them." Id. at 23. In the amended complaint, the plaintiffs alleged that they had a high school education. Dkt. No. 28 at ¶16. They recited these facts apparently to show the "weakness of age" (60), weakness of "mental strength" (permanent disability), dependence (fixed income and low risk tolerance), lack of business knowledge (no investing skill and only high school education), and lack of knowledge (the defendants had material information about Woodbridge, theoretically).

This court held that being in one's early sixties is not elderly, that Mr. Toshner's disability was physical (not mental or cognitive) and most relevant, that the plaintiffs didn't allege "dependence" because they didn't allege that the defendants controlled the plaintiffs' investment accounts.

The plaintiffs therefore pled the following: they were high school-educated individuals, one of whom was over sixty, who had money to invest as the result of an accident, low risk-tolerance and little-to-no investing experience. The defendants were professional brokers who represented that

they were "experts" and were doing "due diligence" on behalf of their clients, and who repeatedly asserted that Woodbridge investments were super safe.

This court noted that the Merrill Lynch and Hatleberg courts, and other courts, give great weight to the degree of control that the defendant had over the plaintiff. Hackman v. First Bank S.E. of Lake Geneva, 568 N.W.2d 321 (Wis. App. 1997) ("The **degree of control** did not rise to the level necessary to create a fiduciary duty.") (emphasis added); Valley Bank-Menomonie v. Computerized Bus. Serv., 1992 WL 126790 at *3 (Ct. App. 1992) ("This is not a case where the borrower was in any sense incompetent, infirm or **peculiarly dependent** upon the bank to make decisions. Placing trust and confidence in a lender does not create a fiduciary relationship.") (emphasis added); Johnson v. Bankers Life and Cas. Co., 973 F. Supp. 2d 950, 957 (W.D. Wis. 2013) (" . . . the case law described above forecloses a fiduciary relationship solely based on an alleged inequality of knowledge.").

Other cases illustrate the requirement that the plaintiff be dependent on the defendant. In Merrill Lynch, the plaintiff was unequal to the defendant because he didn't have access to their market research except by asking them for it. See 127 Wis. 2d at 131–33. But the plaintiff wasn't "dependent" in a meaningful sense, because (1) he had a non-discretionary account, and (2) he was a sophisticated investor. Id. at 135–37. Had the plaintiff had a discretionary account where the broker made all the investment decisions, the case would have been different.

This court contrasted those plaintiffs with the plaintiff in Balistrieri v. Alioto was both dependent on and unequal to the offenders. There, plaintiff Alioto relied on her blood relatives—two brothers who were also lawyers—to manage her financial and legal affairs for over fifty years. Balistrieri v. Alioto, 2005 WL 3210804 at *1–2 (Wis. App. 2005). They acted as her personal lawyers on-and-off during the previous twenty years, and took a personal interest in helping manage her finances. Id. at *6–7. She was also a long-time employee of the defendants' father, and only had a high school education. Id. at *6. The court ruled that these facts gave the brothers a fiduciary duty to Alioto. Id. The court relied primarily on their previous lawyer-client relationship, but also stated that the defendants' interest in her affairs, their decades of support, and the plaintiff's status as a high school-educated worker for their father together independently created "an implied fiduciary relationship based on inequality, dependence, and knowledge of facts." Id. at *7 (emphasis added).

In the case before this court, while the plaintiffs may have been unequal to the defendants, there is no indication of that "peculiar dependence." See Valley Bank-Menomonie, 1992 WL 126790 at *3. The Toshners had control over their account. Like the plaintiff in Merrill Lynch, they weren't "dependent" just because they relied on (and arguably even solicited) the defendant's investment advice. The plaintiffs alleged that the defendants ended their emails with phrases like "doing your due diligence," possibly implying that they were

doing due diligence on the plaintiffs' behalf. The court contrasted these vague statements with Merrill Lynch, in which the broker took affirmative steps to give Boeck special treatment. The broker sent Boeck a letter explaining that Merrill Lynch would implement a new system to give his account extra monitoring. Merrill Lynch, 127 Wis. 2d at 148 (Abrahamson, C.J., concurring). The broker also called Boeck every day—sometimes even twice a day—to keep Boeck abreast of changes in the commodities market. Id. (Abrahamson, C.J., concurring). These clear, affirmative acts did not create a fiduciary relationship, because holding otherwise effectively turn all brokers into "guarantor[s] of a customer's investments." Id. at 137. If the broker's actions in Merrill Lynch did not create a fiduciary duty, the plaintiffs' allegations here certainly do not.

      The Merrill Lynch court gave great weight to the fact that Boeck was a sophisticated commodities investor. By contrast, the Toshners don't know anything about investing. But the Merrill Lynch court was concerned that extending liability would turn brokers into guarantors of investments. Id. at 137. The same concern exists here—finding that the defendants had a duty because of the Toshners' lack of sophistication would turn the defendants into guarantor of investments any time they deal with a physically disabled person of a certain age with a high school education and low or fixed income. This court will not do what the Wisconsin Supreme Court declined to do.

      At the hearing, the plaintiffs asserted that investment advisers, even if unlicensed, have a duty (although they didn't specify what that duty entails or what claims it applies to). See Hearing Recording from 12/20/2019 at 11:08:04–09:23. During the hearing, the court asked the plaintiffs' counsel which case in their brief stood for that proposition. Hearing Recording at 11:10:41–59. Plaintiffs' counsel responded with the following excerpt from Merrill Lynch:

> For the purpose of clarification at the new trial, we note that a broker does not have an *a priori* duty to disclose known and relevant information about investments contemplated by a customer. The broker may simply transact the customer's purchase or sell orders without making any representations. The broker's duty may change, however, if he volunteers information that he was not otherwise obligated to provide. He may not give such information negligently. If such initial information is given, the broker then has a duty to disclose subsequently acquired information that he knows will make a previous representation erroneous or misleading. This duty to disclose only exists if the client has not yet completed his transaction or if the client directs the broker to make subsequent additional transactions in reasonable reliance on the original representation.

127 Wis. 2d at 142–43.

The plaintiffs argued that this paragraph stood for the proposition that brokers can become investment advisers, and thus fiduciaries, if they volunteer information that they had no previous obligation to give. The plaintiffs appeared to focus on the sentence saying "[t]he broker's duty may **change**, however, if he volunteers information that he was not otherwise obligated to provide." See Merrill Lynch, 127 Wis. 2d at 142–43 (emphasis added). The plaintiffs took that idea a step further, arguing that when a broker with no duty to speak ("a retail broker") gives investment advice or makes a misrepresentation, the broker inadvertently transforms the character of the relationship with the customer. Hearing Recording at 11:09:06–10:07, 11:14:23–44. According to the plaintiffs, that broker turned into an "investment adviser," and all investment advisers have fiduciary duties to do due diligence. Id. at 11:14:23–44.

There are several problems with the plaintiffs' argument. First, the plaintiffs cite no case law to support their assertion that all investment advisers are fiduciaries. When they asked at the hearing to identify such a case, the plaintiffs then read the quoted paragraph from Merrill Lynch, acknowledged that the paragraph imposed a duty not to make misrepresentations, read another quote from Merrill Lynch stating that silence can be a negligent misrepresentation, read a third quote from Merrill Lynch saying that Boeck could pursue his negligent misrepresentation claim, and concluded by stating that brokers who make misrepresentations inadvertently create an "investment advice situation," turning the broker into an investment adviser, "and we all know that investment advisers do have a fiduciary duty" because investment advisers are "someone who is not giving just a recommendation, but giving more investment advice." Hearing Recording at 11:10:41–11:14:46.

This argument ignores, or twists, the holding of Merrill Lynch. The plaintiffs assert that brokers who give investment advice become investment advisers, and therefore become fiduciaries. See Hearing Recording at 11:11:32–11:14:46. But the Merrill Lynch court said the opposite: "[a] fiduciary relationship does not arise merely because a broker offers advice and counsel upon which a customer has a right to place trust and confidence." 127 Wis. 2d at 136. The plaintiffs can't circumvent Merrill Lynch by adding an extra step (becoming an investment adviser) between the broker and the fiduciary duty.

Finally, the quoted paragraph had nothing to do with fiduciary duties. After dismissing the fiduciary duty claim, the court decided to remand the case for a new trial on the plaintiff's negligent misrepresentation claim. See Merrill Lynch, 127 Wis. 2d at 141–43. The court wrote the quoted paragraph to help guide the lower court's *negligent misrepresentation* analysis, *not* to provide further analysis about fiduciary duty claims. This court notes that the plaintiffs have not alleged negligent misrepresentation.

For these reasons, the court dismissed without prejudice Counts III and IV.

The court recounted that at the December 20, 2019 hearing, it had dismissed Count V with prejudice to the extent that it alleged violations based on incidents that occurred outside the one-year statute of limitations period, dismissed Counts VI and VII because they were not pled with sufficient specificity to meet the Rule 9(b) standard and dismissed Count VIII with prejudice regarding the conspiracy claim. It also had dismissed Ted Leutz, because he had passed away and because the complaint amended complaint barely mentioned him.

The court also ruled on the defendants' motions to strike, filed in the wake of an unsolicited, post-hearing letter from the plaintiff. Dkt. Nos. 48, 49 and 50. The court granted those motions, because the letter did not comply with the local rules or this court's procedures.

After ruling, the court recapped that the only claim that remained live was Count V to the extent that it alleged incidents that occurred within the one-year limitations period. The court stated that it would allow the plaintiffs one last opportunity to amend, and gave them a deadline of July 31, 2020 by which to do so. The court clarified, however, that it was dismissing Count VIII with prejudice.

The court **ORDERS** the following:

The court **GRANTS** the motion of defendants Lynette Robbins, Ted Leutz and Knowles Systems, Inc. to dismiss Counts I, III, VI, VII and VIII. Dkt. No. 30.

The court **GRANTS IN PART AND DENIES IN PART** the motion of defendants Robbins, Leutz and Knowles Systems, Inc. to dismiss Count V, and **ORDERS** that Count V is dismissed only as to those allegations based on incidents that occurred outside the one-year limitations period. Dkt. No. 30.

The court **GRANTS** defendant Goodman's motion to dismiss Counts II, IV, VI, VII and VIII. Dkt. No. 32.

The court **GRANTS IN PART AND DENIES IN PART** defendant Goodman's motion to dismiss Count V, and **ORDERS** that Count V is dismissed only as to those allegations based on incidents that occurred outside the one-year limitations period. Dkt. No. 32.

The court **GRANTS** defendant Ellis's motion to dismiss Counts I, III, VI, VII and VIII. Dkt. No. 35.

The court **GRANTS IN PART AND DENIES IN PART** defendant Ellis's motion to dismiss Count V, and **ORDERS** that Count V is dismissed only as to those allegations based on incidents that occurred outside the one-year limitations period. Dkt. No. 35.

The court **ORDERS** that the portion of Count V that relates to incidents that took place outside the one-year limitations period and Count VIII are **DISMISSED WITH PREJUDICE**. Counts I, II, III, IV, VI and VII are **DISMISSED WITHOUT PREJUDICE**.

The court **ORDERS** that Ted Luetz is **DISMISSED** as a defendant.

The court **ORDERS** that the motion of Knowles Systems Inc. and Lynette Robbins to strike the letter at Dkt. No. 46 is **GRANTED**. Dkt. No. 48.

The court **ORDERS** that the motion of Jordan Goodman to strike the letter at Dkt. No. 46 is **GRANTED**. Dkt. No. 49.

The court **ORDERS** that the motion of Robin Ellis to strike the letter at Dkt. No. 46 is **GRANTED**. Dkt. No. 50.

The court **ORDERS** that if the plaintiffs wish to file an amended complaint, they must do so by the end of the day on July 31, 2020.

Dated in Milwaukee, Wisconsin this 1st day of June, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**